[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————————

No. 03-14516

———————————————

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 28, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-00925 CV-BBM-1

QUEBELL P. PARKER,
SANDRA SKYPEK,
CHARLES PARKER, individually, as attorneys in fact
for Quebell Parker, and in the name of Quebell Parker,

Plaintiffs-Appellees,

versus

SCRAP METAL PROCESSORS, INC., a Georgia corporation,
L.B. RECYCLING, INC., a Georgia corporation,
J. WAYNE MADDOX, individually and as the successor in
interest to L.B. Recycling, Inc.,

Defendants-Appellants.

———————————————

Appeal from the United States District Court
for the Northern District of Georgia

———————————————

**(September 28, 2004)**

Before BARKETT and KRAVITCH, Circuit Judges, and FORRESTER[*], District Judge.

KRAVITCH, Circuit Judge:

The plaintiffs, Quebell Parker ("Mrs. Parker"), Sandra Skypek, and Charles Parker, (collectively "the Parkers"), filed suit against the defendants, Scrap Metal Processors, Inc. ("SMP") and its predecessors in interest, alleging negligence, negligence per se, nuisance, trespass, violations of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA"), and violations of various state environmental statutes. A jury returned a verdict against the defendants on all counts. The defendants appeal only the jury's determination that they are liable under the CWA and the RCRA, as well as the award of damages. We conclude that there was substantial evidence for the jury to find the defendants liable under the CWA and the RCRA, but reverse the damages award and remand for a new trial on the issue of damages.

I.    FACTS[1]

Mrs. Parker's family has owned the property at 9144 Washington Street, Covington, Georgia ("Parker property") for approximately the past fifty years. Mrs.

---

[*] Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] The facts are taken largely from the district court's order denying the defendants' motion for judgment as a matter of law.

2

Parker moved into the house located on that property in 1983 and lived there until medical problems forced her to move out in 1998. Since then, the house at 9144 Washington Street has remained vacant.[2]

The property adjoining the Parker property is 8194 Washington Street ("defendant property"), which was owned by L.B. Frix for many years. Throughout his ownership, Frix operated many businesses on the property, including a scrap metal yard/junkyard. Frix also leased the property to others. The record demonstrates that Frix allowed a junkyard to operate on the property beginning in the 1960s or 1970s. In approximately 1990, J. Wayne Maddox ("Maddox") took over the scrap metal operation from Frix and began operating a scrap metal yard on the defendant property. Thereafter, Maddox incorporated his business as L.B. Recycling, Inc. ("L.B. Recycling") and operated under that name. In 1994, Mr. Maddox acquired ownership of the defendant property.[3] L.B. Recycling was dissolved in 1995, but Maddox continued to operate the business on the defendant property until he sold the

---

[2] In 2003, after the institution of this suit, Mrs. Parker created a joint tenancy in the Washington Street property. Thus, the property is currently owned by Mrs. Parker, her daughter, Sandra Skypek, and her son, Charles Parker. For the relevant time period prior to 2003, Mrs. Parker was the sole owner. Charles Parker lives in Conyers, Georgia, and Sandra Skypek lives in South Carolina. Neither has lived on the Washington Street property during the relevant time period.

[3] Sometime in late 1993, prior to the purchase of the defendant property, Mr. Maddox obtained ownership of a separate three-acre lot that abuts the property on which Mr. Maddox had been operating the scrap yard. A small, unnamed stream runs through that piece of land.

scrap metal operation to SMP, a business run by Maddox's son, Jason Maddox, in 1999.[4]

The events that led the plaintiffs to file the instant suit began in February 1991. At that time, Maddox contracted with Laurence-David, Inc. to dispose of 1,000 drums of liquid waste. After learning of this contract, the United States Environmental Protection Agency ("EPA") investigated the defendant property in June 1991. The EPA found approximately 600 metal, plastic, and fiber drums on the site, along with twenty-five petroleum underground storage tanks ("USTs"). According to EPA investigation reports, some of the drums appeared to have been crushed or were leaking. There were areas of stained soil and soil samples showed evidence of contamination from metals, petroleum products, solvents, and paint wastes. The EPA sampled eight drums; each contained chemicals and hazardous constituents at levels high enough to present an environmental threat. The EPA also tested three USTs; each contained explosive levels of petroleum vapors.

In 1993, the Georgia Environmental Protection Division ("EPD") inspected the defendant property for possible inclusion on the National Priorities Superfund List. The EPD found the property to be in much the same condition as it was in 1991 when

---

[4] Maddox continues to own the defendant property. His son pays monthly rent. Scrap Metal Processors, Inc., L.B. Recycling, Inc., and Maddox collectively are referred to as the defendants or the appellants.

4

the EPA investigated the site. Both the EPA and the EPD determined that the defendant property presented a likelihood of environmental contamination. The reports from each agency identified several hazardous constituents. No report, however, specifically mentioned the Parker property as potentially contaminated or affected.

Maddox and Mrs. Parker had only a few interactions prior to 1999, when Maddox transferred the operation of the scrap yard to his son. When Maddox began operating his business, however, Mrs. Parker had complained to him about kudzu that was growing on the rear portion of her property. Mrs. Parker also stated that she did not want to see the junk piled on his property.[5] She did not complain about noise, debris, or storm-water runoff. In response to these complaints, Maddox voluntarily removed the kudzu from Mrs. Parker's property, and he placed several large USTs on the edge of his property to block the view from Mrs. Parker's home. Mrs. Parker did not complain about the USTs.

---

[5] The defendant property contains piles of scrap metal, discarded materials, USTs, steel and fiber drums, automobiles, ceramic electrical transformer insulators containing polychlorinated biphenyls ("PCBs"), batteries, automobile seat cushions, concrete materials, tires, and other solid waste. At trial, the plaintiffs submitted photographs depicting these conditions. In addition, examples of some of this waste, which was found on the Parker property, was admitted into evidence.

The only other communication between Mrs. Parker and Maddox was an offer by Mrs. Parker to sell her property to him. Although Maddox made two offers to purchase the property, the two did not agree on a deal.

In 1999, Maddox sold the scrap-metal business to SMP, a corporation owned by Maddox's son, who has continued to operate the business since that time. Today, SMP purchases discarded scrap metal by the pound, separates the metal from non-recoverable materials, and sorts the metal by type. SMP does not recycle the metal itself, but rather sells the metal to recycling facilities.[6]

In addition to these activities, trial testimony from area residents also established that SMP burned solid waste at the facilities. The witnesses observed smoke on various occasions and smelled acrid fumes coming from the facility.

In August 2001, Peachtree Environmental, Inc. ("Peachtree Environmental"), an environmental investigation company, examined the Parker property to determine whether it was contaminated. Soil samples from the Parker property tested positive for PCBs and heavy metals. Two of the five samples had PCB and lead levels above the legal limits in Georgia. The Parkers reported the presence of these hazardous substances to the EPD, which determined that the SMP facility was the likely source

---

[6] Although Maddox and Jason Maddox testified that the materials move from the defendant property quickly, nothing in the record establishes how quickly SMP's inventory of scrap metal is turned over and sold.

of the contamination. In December 2002, the EPD issued a consent order requiring Maddox and SMP to investigate and remedy the Parker property.[7]

SMP does not have a scrap tire identification number, although it stores scrap tires at the facility. In addition, Maddox did not obtain a storm water discharge permit because he was unaware of the permit requirement.[8] His son, Jason, sought the required permit when he was informed of the requirement. Since that time, however, no storm water pollution prevention plan has been developed or implemented. Surface water flows from the SMP facility and the public right-of-way onto the Parker property, depositing dirt and sediment on the property, and eroding it. Storm water also flows from the SMP facility into the unnamed stream. SMP has none of the permits that are required under the RCRA.

The above facts were presented at a jury trial. The jury returned a verdict finding the defendants liable for negligence, negligence per se, trespass, and nuisance. In addition, the jury found that the defendants violated the CWA and that the plaintiffs were entitled to contribution for corrective action under Georgia's Hazardous Site Response Act ("HSRA"), Ga. Code Ann. §§ 12-8-90 through 12-8-97.

---

[7] The Parkers denied the defendants access to their property. The district court rejected Charles Parker's justification for the denial of access, finding that the denial was purely a litigation strategy designed to ensure that the property remained contaminated for trial.

[8] Throughout the trial, the plaintiffs attacked the veracity of the testimony given by Maddox and Jason, but the district court found that both were credible and truthful witnesses.

In light of these findings, the jury awarded punitive damages and attorneys' fees. The jury awarded the Parkers a total of $1.5 million.

After the verdict, Maddox moved for judgment as a matter of law. The district court denied the motion, but vacated portions of the damage award.[9] The defendants appeal the verdicts and the resulting damage awards on many bases. After determining that we have jurisdiction over this appeal, we take up each of the defendants' arguments in turn.

## II.    STANDING

The defendants contend that the plaintiffs lacked standing to pursue their RCRA and CWA claims. Standing is a jurisdictional requirement, and, thus, failure to raise the issue in the district court does not prevent a party from raising the issue on appeal. Granite State Outdoor Advertising, Inc. v. City of Clearwater, 351 F.3d 1112, 1116 n.3 (11th Cir. 2003). In addition, standing must exist with respect to each claim. See Jackson v. Okaloosa County, 21 F.3d 1531, 1536-37 (11th Cir. 1994).

---

[9] The jury awarded a total of $100,000.00 in compensatory damages to the Parkers–$75,000.00 to be paid by Mr. Maddox and $25,000.00 to be paid by SMP. The jury also awarded $120,000.00 in attorneys' fees–$90,000.00 to be paid by Mr. Maddox and $30,000.00 to be paid by SMP. Finally, the jury awarded $1.25 million in punitive damages–$500,000.00 each to be paid by Mr. Maddox and SMP, and $250,000.00 to be paid by L.B. Recycling. After trial, the district court vacated the portion of the jury verdict awarding $250,000.00 in punitive damages against L.B. Recycling, and reduced the punitive damages awarded against Mr. Maddox and SMP to $375,000.00 per defendant. Finally, the court awarded $30,000.00 in corrective action costs. The total amount in damages awarded to the Parkers was $1 million.

Therefore, we must determine whether the plaintiffs had standing under both the RCRA and the CWA. To demonstrate standing, they must meet three requirements:

First and foremost, there must be alleged (and ultimately proved) an injury in fact–a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical. Second, there must be causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability–a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

Wolff v. Cash 4 Titles, 351 F.3d 1348, 1353 (11th Cir. 2003).[10]

A.    Standing Under the RCRA

First, we address whether Mrs. Parker had standing to assert the RCRA claims. The defendants contend that the plaintiffs failed to establish standing because they

---

[10] Our standing inquiry focuses on whether Mrs. Parker has made the necessary showing. Her children, Sandra Skypek and Charles Parker, did not receive an interest in the Parker property until shortly before trial. It is, however, sufficient if one plaintiff has standing to raise the CWA and RCRA claims. See Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1536-37 (11th Cir. 1994) (noting that "at least one named plaintiff must have standing for each of the claims").

did not show an injury-in-fact. The Ninth Circuit, addressing standing in a case very similar to this one, found that the plaintiffs in that case made the requisite showing. There, the Covingtons, who lived across the street from a landfill, alleged that the operators of the landfill violated the RCRA. The Ninth Circuit held:

> If the landfill is not run as required by RCRA, the Covingtons are directly confronted with the risks that RCRA sought to minimize: Fires, explosions, vectors, scavengers, and groundwater contamination, if such occur, threaten the Covingtons enjoyment of life and security of home. Violations of RCRA increase the risks of such injuries to the Covingtons. Such risks from improper operation of a landfill are in no way speculative when the landfill is your next-door neighbor.

Covington v. Jefferson County, 358 F.3d 626, 638 (9th Cir. 2004). Here, Mrs. Parker's factual showing that the soil on her land was contaminated, that USTs were leaking, and that solid waste migrated onto the Parker property is sufficient to satisfy the injury-in-fact requirement. Id.

The defendants also challenge causation and redressability, arguing that any injury is not the result of a violation of the RCRA. The Parkers, however, recovered pieces of solid waste from the property and submitted these at trial. Such evidence shows likely violations of the RCRA by the defendants and, thus, the evidence shows

10

causation. Finally, an injunction preventing the defendants from allowing such waste to migrate onto the Parker property would redress the injury.

B.    Standing Under the CWA

The defendants' arguments with respect to standing under the CWA are almost identical to those raised with respect to standing under the RCRA. As under the RCRA, we reject these arguments. Mrs. Parker demonstrated an injury-in-fact by showing that water runoff originating on the defendants' property caused hazardous substances, such as PCBs and lead, to migrate onto the Parker property, where the substances contaminated the soil and eventually made their way to the stream. This injury is fairly traceable to the defendants' alleged failure to obtain or comply with their NPDES permit. A favorable decision on the merits would adequately redress Mrs. Parker's injury because such a decision would require the defendants to obtain and comply with the required permit.[11]

---

[11] The dissent challenges our conclusion that Mrs. Parker has demonstrated standing to raise the CWA claims because Mrs. Parker has not pleaded or proved an aesthetic or recreational injury, and because Mrs. Parker is not a riparian owner of the stream. Such allegations are sufficient, but not necessary, to satisfy the injury-in-fact requirement. See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (noting that "[i]n *some instances*, environmental injury can be demarcated as a traditional trespass on property or a tortious injury to a person. In *other cases*, however, the damage is to an individual's aesthetic or recreational interests" (emphasis added)). The dissent has not cited to any case that *requires* the plaintiff to allege an aesthetic or recreational injury, or to be a riparian owner, but, rather, has cited to several cases stating that such allegations are sufficient. At least one case, however, belies the dissent's conclusion. In Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 182-83 (2000), Gail Lee "attested that her home, *which is near* Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that she believed the

11

## III.   SUBJECT-MATTER JURISDICTION

The defendants devote a substantial portion of their brief to the contention that this court lacks subject-matter jurisdiction over the plaintiffs' RCRA and CWA claims. They contend that Georgia has implemented its own programs under these statutes and, therefore, the plaintiffs' claims do not arise under federal law, but,

pollutant discharges accounted for some of the discrepancy." (Emphasis added). There is no suggestion in the Supreme Court's opinion that Lee alleged an aesthetic or recreational injury, or that Lee was a riparian owner, but the Supreme Court held that her sworn statement adequately demonstrated an injury-in-fact. Id. at 183. The injury alleged by Mrs. Parker in this case is remarkably similar to the injury alleged by Lee in Laidlaw. In both cases, the plaintiff owned property "near" a facility alleged to have discharged pollutants into navigable waters. Furthermore, in both cases, the plaintiffs alleged that the value of their property was diminished, at least in part due to the pollution from the polluting facility. Thus, Mrs. Parker has adequately demonstrated an injury-in-fact. Moreover, "[t]he relevant showing for purposes of Article III standing . . . is *not injury to the environment* but *injury to the plaintiff.*" Laidlaw Envtl. Servs., 528 U.S. at 181. This fact strengthens Mrs. Parker's standing claim because she has shown an injury to her property and, therefore, to herself.

Additionally, the dissent appears to have misinterpreted the cases discussing the need for a "significant nexus" or a "hydrologic connection" to waters of the United States. These cases do not assert that there must be a "significant nexus" or a "hydrologic connection" between damaged *property and a navigable water* of the United States. Rather, the cases assert that there must be a "significant nexus" or a "hydrologic connection" between the *water into which pollutants are discharged and some body of water that unquestionably qualifies as a navigable water under the statute*. In that context, some courts have stated that, in order to have a valid claim under the CWA, pollutants must be discharged into a body of water that has a "significant nexus" to a body of water that unquestionably qualifies as a navigable water under the statute (a body of water that is navigable-in-fact), see In re Needham, 354 F.3d 340, 345-47 (5th Cir. 2003), while other courts require only that the discharge be into a body of water that has a "hydrologic connection" to such a navigable water, see United States v. Rapanos, 339 F.3d 447, 453 (6th Cir. 2003). In other words, these cases discuss what bodies of water qualify as navigable waters under the CWA, and do not discuss the necessary nexus between the alleged injury and the water at issue in the case. Thus, the dissent's reliance on these cases is misplaced because, in this case, the stream into which the pollutants have allegedly been discharged is unquestionably a navigable water of the United States. See infra.

12

rather, that the plaintiffs' allegations consist entirely of state law claims, which must be brought in state court.[12]

The CWA allows states to implement their own permit programs after receiving EPA authorization, 33 U.S.C. § 1342(b), and Georgia has done so. The defendants argue that Georgia's program transforms the plaintiffs' CWA claims into state law claims, and, therefore, the claims do not arise under federal law. U.S. Const. Art. III, § 2, cl. 1; 28 U.S.C. § 1331. In this case, the plaintiffs alleged two CWA violations. First, they alleged that the defendants discharged a pollutant into waters of the United States without obtaining a National Pollutant Discharge Elimination System ("NPDES") permit. In response, the defendants contend that they obtained the required permit prior to the commencement of the plaintiffs' suit. Thus, according to the defendants, this violation is a wholly past violation over which we do not have jurisdiction. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49 (1987), superseded by statute on other grounds as stated in Glazer v. Am. Ecology Envtl. Servs. Corp., 894 F. Supp. 1029 (E.D. Tex. 1995). Second, the plaintiffs alleged that the defendants have not complied with the conditions of their permit. The defendants respond that the permit was obtained pursuant to state law, and we

---

[12] We do not have diversity jurisdiction. Other than the CWA and RCRA claims, all of the plaintiffs' claims are state law claims. Thus, if we do not have federal question jurisdiction as a result of the CWA or RCRA claims, we do not have jurisdiction to decide this case.

do not have jurisdiction over a violation of state law. Even assuming that the defendants are correct with regard to their first argument–that we do not have jurisdiction of the plaintiffs' first claim regarding a discharge into United States' waters because it is a wholly past violation–we conclude that we do have jurisdiction over the case pursuant to the second claim–that the defendants violated conditions of their permit. The plain language of the CWA and the relevant case law dealing with the CWA convince us that there is federal jurisdiction over citizen-suit claims that allege violations of a state-issued NPDES permit.

We begin our analysis with the language of the CWA citizen-suit provision, which provides that federal courts have jurisdiction over citizen suits alleging violations of the CWA. The CWA citizen-suit provision allows "any citizen" to sue "any person . . . who is alleged to be in violation of (A) an *effluent standard or limitation under this chapter*." 33 U.S.C. § 1365(a)(1) (emphasis added). In addition, the statute confers jurisdiction on the district courts for citizen suits to enforce "*an effluent standard or limitation under this chapter*." 33 U.S.C. § 1365(a) (emphasis added). The relevant question, then, is whether EPA-approved state permit conditions qualify as "an effluent standard or limitation under this chapter." Again, the text of the statute is revealing. "Effluent standard or limitation under this chapter" is defined to include "a permit or condition thereof issued under section 1342 of this

14

title." 33 U.S.C. § 1365(f)(6). Section 1342(b), in turn, authorizes states to administer their own permit programs, and thereby issue state permits, after receiving EPA approval. Thus, a plain reading of this statute indicates that state permits and conditions fall within the effluent standards or conditions covered "under this chapter."[13]

We continue our analysis by looking at the relevant case law. First, we note that the Supreme Court appears to have rejected the defendants' contention–that federal courts do not have jurisdiction over CWA citizen suits alleging a violation of an EPA-approved state permit condition. In EPA v. California, the Supreme Court stated that "a *citizen* may commence civil actions in district court 'against any person

[13] In so concluding, we note that the RCRA's citizen-suit provision contains language very similar to that contained in the CWA's citizen-suit provision. See 42 U.S.C. § 6972(a)(1)(A) (conferring jurisdiction over citizen suits alleging a "violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter"). We express no opinion as to whether the language in the RCRA grants federal courts jurisdiction over citizen suits alleging a violation of an EPA-approved state law under the RCRA. The issue under the RCRA is more complicated than under the CWA because a state's EPA-approved program under the RCRA operates "in lieu of the federal program." 42 U.S.C. § 6926(b); compare Ashoff v. City of Ukiah, 130 F.3d 409, 411 (9th Cir. 1997) (holding that the RCRA authorizes jurisdiction over citizen suits based on the federal minimum standards, but not over state standards that exceed the federal minimums), _with_ City of Heath v. Ashland Oil Co., 834 F. Supp. 971, 979 (S.D. Ohio 1993) (determining that a "citizen suit is not available in an authorized state for an alleged violation of a federal provision superseded by state law" and noting that "there is a clear position among several courts that an (sic) RCRA citizen suit is not available to enforce a state authorized program"), and Chemical Weapons Working, Group, Inc. v. United States Dep't of the Army, 990 F. Supp. 1316, 1319 (D. Utah 1997) (holding that once the EPA authorized Utah to administer the provisions of the RCRA, "the federal statute was no longer applicable," and allowing suit only for alleged violations of state law). EPA-approved state programs under the CWA do not operate "in lieu" of the federal CWA program.

. . . who is alleged to be in violation of . . . an effluent standard or limitation under this Act.'" 426 U.S. 200, 223-24 (1976), <u>superseded by statute on other grounds as stated in</u> <u>Parola v. Weinberger</u>, 848 F.2d 956 (9th Cir. 1988) (quoting 33 U.S.C. § 1365(a)(1) (1979 ed., Supp. IV)) (emphasis added). The Court then analyzed the meaning of "effluent standard or limitation," and noted that "[t]he reference in § 505(f)(6) [33 U.S.C. § 1365(f)(6)] to requirements applicable by reason of § 313 [33 U.S.C. § 1323][14] is to be read as making clear that *all dischargers . . . may be sued* to enforce permit conditions, *whether those conditions arise* from standards and limitations promulgated by the Administrator or *from stricter standards established by the State*." <u>Id.</u> at 224 (emphasis added). Thus, the Supreme Court apparently has incorporated state law standards under the CWA into federal environmental law for jurisdictional purposes.[15]

---

[14] 33 U.S.C. § 1365(f)(6) states that "effluent standard or limitation" means "a permit or condition . . . issued under section 1342 of this title . . . (including a requirement applicable by reason of section 1323 of this title)." Thus, the fact that the Supreme Court was referring specifically to § 1323, rather than § 1342 is not determinative.

[15] The Second Circuit has questioned this conclusion. <u>See</u> <u>Atlantic States Legal Found., Inc. v. Eastman Kodak Co.</u>, 12 F.3d 353, 358-59 (2d Cir. 1993). There, the Second Circuit stated: "[S]tate regulations . . . which mandate 'a greater scope of coverage than that required' by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365." <u>Id.</u> at 359 (quoting 40 C.F.R. § 123.1(i)(2)). As support for this assertion, the Second Circuit cited to <u>United States Dep't of Energy v. Ohio</u>, 503 U.S. 607, 623-27 (1992), <u>superseded by statute as stated in</u> <u>City of Jacksonville v. Dep't of Navy</u>, 348 F.3d 1307, 1319 (11th Cir. 2003). We think the Second Circuit reads <u>Department of Energy</u> too broadly.

The issue in <u>Department of Energy</u> was whether Congress waived the United States'

Second, the Supreme Court implicitly has held that federal courts have subject-matter jurisdiction over cases that assert a violation of a state-issued NPDES permit. In Gwaltney, the plaintiff alleged that "petitioner 'has violated . . . [and] will continue to violate its NPDES permit.'" 484 U.S. at 54. The permit in question was issued by the Virginia State Water Control Board, which is Virginia's equivalent of the Georgia

sovereign immunity from liability for civil fines imposed by a state for violations of state standards that had been approved by the EPA. Id. at 611. Section 1323(a) of the CWA provides that "'the United States shall be liable only for those civil penalties *arising under Federal law* or imposed by a State or local court to enforce an order or the process of such court.'" United States Dep't of Energy, 503 U.S. at 623 (emphasis added). The State of Ohio argued that this language operated as a waiver of sovereign immunity from liability for civil fines imposed under EPA-approved state laws. There, Ohio had received EPA approval for a state-run CWA program and urged the Supreme Court to find that the phrase "arising under Federal law" be read to include "penalties prescribed by state statutes approved by EPA and supplanting the CWA." Id. at 624. The Supreme Court rejected Ohio's contention, noting that the phrase "arising under federal law" also appears in Congress's statutory grant of jurisdiction to the federal courts over general federal-question cases. The Supreme Court then explained that, in the context of that statutory grant of jurisdiction, "the phrase 'arising under' federal law . . . exclude[s] cases in which the plaintiff relies on state law, even when the State's exercise of power in the particular circumstances is expressly permitted by federal law." Id. at 625.

As in Department of Energy, where Ohio had enacted an EPA-approved program under the CWA, Georgia has enacted such a program here. Thus, the Supreme Court's discussion of the "arising under" language, at first glance, appears to preclude federal subject-matter jurisdiction of CWA cases brought pursuant to a state law that has received EPA approval. That conclusion, however, is correct only if one presumes that federal courts have jurisdiction over CWA citizen suits as a result of the grant of general federal question jurisdiction contained in 28 U.S.C. § 1331. Here, however, we rely on the CWA's specific grant of jurisdiction rather than 28 U.S.C. § 1331.

As discussed above, the citizen-suit provision of the CWA gives federal courts an independent basis of jurisdiction. The relevant question is whether a state standard enacted pursuant to the CWA is "an effluent standard or limitation under this chapter." 33 U.S.C. § 1365. On this question, the Supreme Court, although in dicta, has appeared to say yes, suggesting that citizens can sue under § 1365 regardless of whether the suit is based on standards promulgated by the EPA, or more stringent state standards that have received EPA approval. E.P.A. v. California, 426 U.S. at 224.

17

EPD–it is in charge of Virginia's EPA-approved CWA program. Id. at 52-53. Thus, the issue in Gwaltney was almost identical to the issue here. After concluding that there is no federal subject-matter jurisdiction over wholly past violations, the Court addressed whether a good-faith allegation that the defendants are continuing to violate a permit-condition confers jurisdiction over a citizen suit. The Court concluded: "[W]e agree that § 505 [33 U.S.C. § 1365] confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." Id. at 64. The Court remanded the case so that the lower court could consider whether the complaint made such a good-faith allegation. Id. at 67. By so deciding, the Supreme Court implicitly decided that there is subject-matter jurisdiction over citizen suits that allege a violation of a state-issued NPDES permit as long as the violation is not wholly past.

Finally, most federal courts that have considered the matter have decided that there is federal jurisdiction over citizen suits brought pursuant to state-issued NPDES permits. In fact, with the exception of the Second Circuit in Atlantic States, we have not found, and the parties did not cite to us, any authority indicating that federal courts lack jurisdiction over CWA claims brought pursuant to EPA-approved state permits. On the other hand, however, several cases have specifically decided that there is federal question jurisdiction over such cases. Northwest Envtl. Advocates v.

18

City of Portland, 56 F.3d 979, 985-90 (9th Cir. 1995) (examining cases and legislative history and concluding that the grant of federal jurisdiction for CWA citizen suits includes a grant over suits alleging a violation of Oregon's water quality standards); Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta, 953 F. Supp. 1541, 1552-53 (N.D. Ga. 1996) (collecting cases and stating "the Clean Water Act expressly contemplates stricter state effluent and other limitations deemed necessary by the state to restore the integrity of the waters within the state, allows states to incorporate those limitations into a state-issued permit, and authorizes a citizen suit to enforce those limitations"); Culbertson v. Coats Am., Inc., 913 F. Supp. 1572, 1581 (N.D. Ga. 1995) ("The CWA authorizes citizen suits for the enforcement of all conditions of NPDES permits. . . . Plaintiffs may therefore bring suit under the CWA for violations of the Georgia Rules.").

On these bases, we reject the defendants' contention that federal courts do not have jurisdiction over CWA cases that are brought pursuant to state-issued NPDES permits, and hold that there is federal subject-matter jurisdiction over such cases.

The defendants also argue that federal courts lack jurisdiction over citizen suits alleging a violation of a state law that has become effective due to EPA approval under the RCRA. We need not decide this issue because we already have concluded that we have jurisdiction of this case due to the plaintiffs' CWA claims. As a result,

19

we have supplemental jurisdiction over the plaintiffs' RCRA claims. See 28 U.S.C. § 1367 (conferring jurisdiction over claims related to a claim over which we have jurisdiction).

IV.    Clean Water Act Claims

The defendants contend that the Parkers failed to prove any violation of the CWA. Specifically, the defendants argue that the evidence does not establish a discharge of pollutants into waters of the United States without a permit.

To establish a CWA violation, the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES permit. State of Ga. v. City of East Ridge, 949 F. Supp. 1571 (N.D. Ga. 1996) (citing Ninth Circuit and D.C. Circuit cases); see Driscoll v. Adams, 181 F.3d 1285 (11th Cir. 1999). The defendants contend that the plaintiffs failed to prove that (1) the alleged discharges were from a point source, (2) such discharges were made to waters of the United States, or (3) that any discharges occurred within the applicable limitations period. The defendants concede that storm-water runoff from the SMP facility entered the Parker property from time to time, but

argue that there was no evidence showing that such runoff originated at a point source, or that the runoff entered waters of the United States.[16]

A "point source" is "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). At trial, the plaintiffs produced photographs showing (1) erosion gullies leading downhill to the stream, (2) debris strewn on the defendant property, and (3) various machines, such as large trucks and construction equipment. We hold that this debris and construction equipment qualifies as a point source under the CWA.

We interpret the term "point source" broadly. Dague v. City of Burlington, 935 F.2d 1343, 1354-55 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992) ("The concept of a point source was designed to further this scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States."). Storm-water runoff does not, in all circumstances, originate from a point source, but several courts have concluded that it does when storm water collects in piles of industrial debris and eventually enters navigable waters. Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897,

---

[16] The defendants do not argue that they did not discharge a pollutant. Accordingly, they have abandoned this argument. United States v. Jernigan, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003).

922 (5th Cir. 1983) ("[W]e agree with the district court that the bulldozers and backhoes were 'point sources,' since they collected into windrows and piles material that may ultimately have found its way back into the waters."). The piles of debris in this case collected water, which then flowed into the stream.[17] They are, therefore, point sources within the meaning of the CWA. Moreover, the plaintiffs produced photographs of backhoes and other earth-moving equipment, which are also point sources. Id.

The defendant's second contention is that there was no evidence the defendants made any discharge into "navigable waters," which are defined as "waters of the United States." 33 U.S.C. § 1362(7). The term "navigable" has little importance, and "navigable waters" includes tributaries of waters that can be navigated. United States v. Eidson, 108 F.3d 1336, 1342 (11th Cir. 1997). Thus, "ditches and canals, as well as streams and creeks" are navigable waters if they are tributaries of a larger body of water. Id.; see also Driscoll, 181 F.3d at 1291; United States v. Ashland Oil & Transp. Co., 504 F.2d 1317, 1325 (6th Cir. 1974) ("[W]e believe Congress knew exactly what it was doing and that it intended the Federal Water Pollution Control Act

---

[17] Whether the erosion gullies from which the water flowed into the stream were constructed by the defendants is irrelevant. See Sierra Club v. Abston Constr. Co., 620 F.2d 41, 45 (5th Cir. 1980). This case is binding precedent under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

22

to apply, as Congressman Dingell put it, 'to all water bodies, including main streams and their tributaries.'"). Here, the plaintiffs presented evidence establishing that storm-water runoff entered the stream behind the property. This stream is a tributary of the Yellow River. Thus, the stream is a "navigable water," or "water of the United States" under the CWA.

Next, the defendants argue that the plaintiffs failed to prove there was any ongoing violation. Citizens can only bring a citizen suit under the CWA for ongoing or continuous violations, not for those that are wholly in the past. Gwaltney, 484 U.S. at 56-63. The defendants contend that they obtained a permit before the plaintiffs commenced this suit; thus, any violation is wholly past. The plaintiffs counter that the defendants are in violation of Georgia General Industrial Storm Water Permit GAR 000000.

To find the defendants liable under the CWA, the jury must have found that there was a continuing violation. We review a jury's verdict to determine whether reasonable and impartial minds could reach the conclusion the jury expressed in its verdict. Liberty Mut. Ins. Co. v. Falgoust, 386 F.2d 248, 253 (5th Cir. 1967).[18] The verdict must stand unless "there is no substantial evidence to support it." Id. We

---

[18] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all published decisions of the former Fifth Circuit issued before October 1, 1981.

consider the evidence in the light most favorable to the appellees and deduce all inferences in their favor. Id. We do not weigh conflicting evidence "where there is a reasonable basis in the record for the jury's verdict." Id.

Amongst other requirements, the GAR 000000 requires a permittee to identify all potential sources of pollution, describe practices designed to reduce or eliminate pollution from storm water, and ensure the implementation of these practices. At trial, Jason Maddox testified that SMP had not "done any storm water monitoring." In addition, Jason testified that he would be in charge of implementing whatever storm water plan is devised. Finally, the plaintiff's expert, Charles MacPherson, the executive vice president of Peachtree Environmental, testified that his company's examination of the SMP facility revealed that SMP had no controls for any surface water. Taken in the light most favorable to the plaintiffs, this testimony establishes that SMP had not identified potential sources of pollution or designed a plan to reduce pollution. Thus, we hold that there was substantial evidence for the jury to conclude that there was an ongoing violation of permit conditions at the time of the trial.[19]

---

[19] We note that there was also evidence that SMP did not have, and, therefore could not be in compliance with, Georgia General Construction Storm Water Permit, GAR 100000.

For the above reasons, we hold that the plaintiffs adequately proved that the defendants violated the CWA and that the violation was ongoing at the time of trial.

V.    Resource Conservation and Recovery Act Claims

The RCRA is a comprehensive environmental statute that establishes a cradle-to-grave system for regulating the disposal of solid and hazardous waste. United States v. ILCO, Inc., 996 F.2d 1126, 1130 (11th Cir. 1993). Pursuant to the RCRA, the EPA has issued regulations detailing the standards for disposal of solid and hazardous waste. See 40 C.F.R. §§ 124, 260-65, 268, 270. The Act, however, also allows approved states to implement and enforce its provisions. 42 U.S.C. § 6926(b). Georgia received approval in 1979 and enacted the Hazardous Waste Management Act ("HWMA"), Ga. Code Ann. §§ 12-8-60 through 12-8-83, and the Comprehensive Solid Waste Management Act ("SWMA"), Ga. Code Ann. §§ 12-8-20 through 12-8-59.2, to regulate solid and hazardous waste. The plaintiffs alleged six independent violations of state and federal RCRA regulations, standards, and prohibitions.[20] The

---

[20] We note that L.B. Recycling no longer exists and cannot, therefore, be in violation of the RCRA. See Gwaltney, 484 U.S. at 57-58 (interpreting the CWA and concluding that a continuous or ongoing violation is required for liability to attach). The relevant language in the RCRA is identical to that in the CWA. Thus, a continuous or ongoing violation is required for liability to attach under the RCRA.

25

defendants, however, only offer arguments with respect to five of these.[21] We address each of the defendants' arguments in turn.

A.      Solid Waste Handling Permit

Plaintiffs first claim that the defendants operated the SMP facility without obtaining a solid waste handling permit. Under Georgia law, a person generally must obtain a permit in order to handle solid waste. Ga. Code Ann. § 12-8-24 ("No person shall engage in solid waste or special solid waste handling in Georgia or construct or operate a solid waste handling facility in Georgia . . . without first obtaining a permit from the director authorizing such activity.").[22] It is undisputed that the defendants never had a solid waste handling permit and were, therefore, in violation of the SWMA if they handled solid waste unless an exception to the permit requirement applied.

Georgia has broadly defined solid waste as "any garbage or refuse; sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility; and *other discarded material* including solid, semisolid, or contained gaseous

---

[21] The defendants failed to respond to the plaintiffs' allegation that the defendants burned solid waste in violation of state and federal rules.

[22] "'Solid waste handling' means the storage, collection, transportation, treatment, utilization, processing, or disposal of solid waste or any combination of such activities." Ga. Code Ann. § 12-8-22(34). Similarly, a "solid waste handling facility" is "any facility the primary purpose of which is the storage, collection, transportation, treatment, utilization, processing, or disposal, or any combination thereof, of solid waste." Ga. Code Ann. § 12-8-22(35).

material resulting from industrial, commercial, mining, and agricultural operations and community activities." Ga. Code Ann. § 12-8-22(33) (emphasis added). The material on the defendant property, including scrap metal, junked cars, old drums, defunct USTs, and other metal objects, was solid waste because it was "discarded material." See ILCO, 996 F.2d at 1131 (citing 40 C.F.R. § 261.2(a)(2)).[23] Thus, the defendants were required to have a solid waste handling permit unless an exception to the permit requirement applied.

Defendants contend that they did not need a solid waste handling permit because the materials on their property were "recovered materials"[24] and SMP was a "recovered materials processing facility."[25] "Recovered materials" are excluded from the definition of "solid waste." Ga. Code Ann. § 12-8-22(33); Ga. Comp. R. & Regs. r. 391-3-4-.04(7)(a). If, however, materials that would otherwise qualify as "recovered materials" are "accumulated speculatively," they are considered "solid

---

[23] We note that ILCO refers to federal regulations, but because the federal definition of solid waste is almost identical to the Georgia definition, we adopt the language in ILCO when defining "discarded material" under Georgia law. Compare Ga. Code Ann. § 12-8-22(33) with 42 U.S.C. § 6903(27).

[24] "'Recovered Materials' means those materials which have known use, reuse, or recycling potential; can be feasibly used, reused or recycled; and have been diverted or removed from the solid waste stream for sale, use, reuse, or recycling, whether or not requiring subsequent separation and processing." Ga. Comp. R. & Regs. r. 391-3-4-.01(55).

[25] A "recovered materials processing facility" is "a facility engaged solely in the storage, processing, and resale or reuse of recovered materials." Ga. Comp. R. & Regs. r. 391-3-4-.01(56).

27

waste and must comply with all . . . regulations." Ga. Comp. R. & Regs. r. 391-3-4-.04(7)(b). Thus, no permit was required if the materials on the defendant property were recovered materials, unless they were accumulated speculatively. The defendants contend that the materials in their facility fit this exception. The district court disagreed, finding that the materials on the SMP facility were accumulated speculatively and, therefore, a permit was required. We review that legal conclusion de novo.

We affirm the district court's determination that the materials on the SMP facility were accumulated speculatively. To show that recovered materials are not accumulated speculatively, SMP "can show that there is a *known use, reuse, or recycling potential for the material*, that the material can be feasibly sold, used, reused, or recycled and that during the *preceding 90 days the amount of material that is recycled, sold, used, or reused equals at least 60 percent by weight or volume of the material received* during that 90-day period and 60 percent by weight or volume of all material previously (sic) received and not recycled, sold, used, or reused and carried forward into that 90-day period." Ga. Comp. R. & Regs. r. 391-3-4-.04(7)(c) (emphasis added). The defendants, in order to satisfy their burden, must at the least, provide proof of the volume of sales "in the form of bills of sale, or other records showing adequate proof of movement of the material in question to a recognized

28

recycling facility or for proper use or reuse from the accumulation point." Ga. Comp. R. & Regs. r. 391-3-4-.04(7)(d). The defendants have not pointed to, and we could not find, any proof that is acceptable under the regulations to prove that the turnover rate of their scrap metal meets the necessary requirements. Therefore, we cannot find that the materials on the SMP facility are excluded from the definition of solid waste. On this basis, we conclude that those materials are "discarded material," which is "solid waste," and SMP must have a solid waste handling permit.[26]

## B. Open Dumping

Second, the jury determined that Mr. Maddox and SMP violated the RCRA's prohibition on open dumping. The defendants argue only that the plaintiffs failed to prove that SMP constitutes an open dump.

Under the RCRA, "any solid waste management practice or disposal of solid waste which constitutes the open dumping of solid waste or hazardous waste is prohibited." 42 U.S.C. § 6945(a). An "open dump" is defined as "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for

---

[26] To be precise, SMP is a "materials recovery facility" under the SWMA because it is "a solid waste handling facility that provides for the extraction from solid waste of recoverable materials", Ga. Comp. R. & Regs. r. 391-3-4-.01(35). To legally operate as a "materials recovery facility" requires a solid waste handling permit. Ga. Code Ann. § 12-8-24; Ga. Comp. R. & Regs. r. 391-3-4-.02(1).

disposal of hazardous waste." 42 U.S.C. § 6903(14). Thus, to prove that SMP qualifies as an open dump, the Parkers must show: (1) solid waste, (2) is disposed at SMP, (3) that SMP does not qualify as a landfill under § 6944, and (4) that SMP does not qualify as a facility for the disposal of hazardous waste. As discussed above, the materials on the SMP facility are solid waste. Thus, we must only address the latter three issues.

The first issue is whether the solid waste is "disposed of" at the SMP facility. "Disposal" is defined broadly as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3). The defendants placed scrap metal and other materials throughout their property. There can be little doubt that, by doing so, the defendants placed solid waste on their property in such a manner that the waste could enter the environment. Therefore, the defendants "disposed of" solid waste under the RCRA's definition.

Because solid waste was "disposed of" at the SMP facility, the defendants operated an open dump unless the facility qualified under either of the two statutory exceptions: sanitary landfills and hazardous waste facilities. The defendants make

no contention that the SMP facility was a sanitary landfill; thus, the only issue is whether SMP was a "facility for the disposal of hazardous waste."

Under the RCRA, a facility for the disposal of hazardous waste must have a permit. 42 U.S.C. § 6925(a). In order to obtain such a permit, a facility for the disposal of hazardous waste must meet many specific criteria. 42 U.S.C. §§ 6921-39e; Ga. Code Ann. §§ 12-8-6- through 12-8-83. Undisputedly, SMP did not satisfy these requirements and, therefore, it could not have been a "facility for the disposal of hazardous waste." Thus, because the defendants disposed of solid waste at the SMP facility and because the facility was not a sanitary landfill or a facility for the disposal of solid waste, SMP was an open dump. Because SMP did not have the permit required to operate an open dump, it was in violation of the open-dumping provisions of the RCRA. Likewise, Mr. Maddox, as the owner of the property, violated the RCRA's open-dumping provisions because no person may "cause, suffer, allow or permit open dumping on his property." Ga. Comp. R. & Regs. r. 391-3-4-04(4)(c).

C.    Scrap Tire Requirements

The plaintiffs alleged and the jury found that the defendants violated Georgia's regulations governing scrap tire management. Under Georgia law, "any person who generates scrap tires shall have a Scrap Tire Generator Identification Number (ID#)

31

issued by the [EPD]." Ga. Comp. R. & Regs. r. 391-3-4-.19(4)(a). Scrap tire generators must also "initiate a manifest to transport scrap tires" and must report the "number of scrap tires transported and the manner of their disposition." Id. at r. 391-3-4-.19(4)(b),(e).

SMP was a "scrap tire generator" under the SWMA and, therefore, had to comply with the above requirements. The term "scrap tire generator" is defined broadly to include "any person who generates scrap tires. Generators may include, but are not limited to, retail tire dealers, retreaders, *scrap tire processors*, automobile dealers, private company vehicle maintenance shops, garages, service stations, and city, county, and state governments." Ga. Comp. R. & Regs. r. 391-3-4-.19(2)(i) (emphasis added). "Scrap tire processing," in turn, means "any method, system, or other treatment designed to change the physical form, size, or chemical content of scrap tires and includes all aspects of its management (administration, personnel, land, equipment, buildings, and other elements). Processing includes, but is not limited to, shredding, baling, recycling, or sorting of scrap tires." Ga. Comp. R. & Regs. r. 391-3-4-.19(2)(j). Thus, those who sort, shred, or recycle scrap tires are "scrap tire generators" under Georgia law. SMP removed tires from junk cars brought to the facility. These tires were then either taken to a recycling facility or to a local dump. As such, SMP was required to have a scrap tire identification number

and to comply with Georgia's record and reporting requirements.[27]  SMP, however, admitted that it did not have an ID number and, thus, SMP violated Georgia's permit requirements for scrap tire generators.

### D.    Disposal of Prohibited Waste

Under Georgia law, certain materials may not be disposed of at solid waste facilities.  Ga. Comp. R. & Regs. r. 391-3-4-.04(6)(b).  These materials include lead acid batteries, liquid waste, and PCBs.  Id.  Any person who accepts such waste for disposal is in violation of Georgia law.  Ga. Comp. R. & Regs. r. 391-3-4-.04(6)(c).

The defendants argue that the plaintiffs did not prove their claim that the defendants accepted prohibited waste because, according to the defendants, the plaintiffs' only evidence of prohibited waste on the SMP facility was that Maddox accepted drums of liquid waste in the early 1990s.  The defendants argue that the drums were not sufficient to establish a violation of Georgia law because claims based on activities that occurred in the early 1990s are barred by the five-year statute of limitations applicable to RCRA citizen suits brought under 42 U.S.C. § 6972(a)(1)(A).  See 28 U.S.C. § 2642.  Assuming that the five-year statute of

---

[27] Any violation of these provisions by Mr. Maddox and L.B. Recycling was wholly in the past.  Neither is a person "presently engaged in . . . [the] handling of scrap tires."  Ga. Comp. R. & Regs. r. 391-3-4-.19(1)(a).

limitations applies, we find that other evidence supports the jury's determination that the defendants accepted prohibited waste.

The evidence established that SMP accepted waste containing hazardous materials. At trial, the Parkers presented photographic evidence of electrical transformers, which, according to the plaintiffs' expert, contained PCBs. No evidence contradicted the expert's assertion that this waste was accepted within the statute of limitations. Thus, there was sufficient evidence to support the jury's verdict.

E.    Imminent and Substantial Endangerment

A citizen may bring suit "against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Section 6972(a)(1)(B), unlike § 6972(a)(1)(A), explicitly considers the environmental and health effects of waste disposal and authorizes suit any time there is an "imminent and substantial endangerment to health or the environment." The section applies retroactively to past violations, so long as those violations are a present threat to health or the environment. Meghrig v. KFC Western, Inc., 516 U.S. 479, 485-86 (1996). To prevail on a claim under § 6972(a)(1)(B), the plaintiffs must prove: "(1)

34

that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment." Cox v. City of Dallas, 256 F.3d 281, 292 (5th Cir. 2001); see 42 U.S.C. § 6972(a)(1)(B). As shown above, the defendants disposed of solid waste, and, therefore, they contributed, or were contributing, to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste. Thus, the first two elements were met. We address only the third and find that there was sufficient evidence to support the jury's finding that the SMP facility "may present" an imminent and substantial threat.

The operative word in the statute is the word "may." Accordingly, the plaintiffs need only demonstrate that the waste disposed of "may present" an imminent and substantial threat. 42 U.S.C. § 6972(a)(1)(B); Cox, 256 F.3d at 299. Similarly, the term "endangerment" means a threatened or potential harm, and does not require proof of actual harm. See Meghrig, 516 U.S. at 486 (noting that "there must be a threat which is present now, although the impact of the threat may not be

35

felt until later"). The endangerment must also be "imminent." The Supreme Court found that "[a]n endangerment can only be 'imminent' if it 'threatens to occur immediately.'" Id. at 485 (quoting Webster's New International Dictionary of English Language 1245 (2d ed. 1934)). Because the operative word is "may," however, the plaintiffs must show that there is a potential for an imminent threat of a serious harm, see Cox, 256 F.3d at 300 (noting that "an 'endangerment' is substantial if it is 'serious'"), to the environment or health. See United States v. Price, 688 F.2d 204, 213-14 (3d Cir. 1982) (noting that § 6972(a)(1)(B) contains "'expansive language'" that confers "'upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes'"); see also Dague v. City of Burlington, 935 F.2d 1343, 1355 (2d Cir. 1991), rev'd in part on other grounds, 505 U.S. 557 (1992) (quoting Price).

The Parkers produced sufficient evidence to establish that the defendants' past handling, storage, and disposal of hazardous wastes may have presented an imminent and substantial endangerment to the environment. The evidence showed that Mr. Maddox and L.B. Recycling contracted with Laurence-David, Inc. to dispose of 1,000 drums of liquid waste. The EPA detected hazardous constituents, including lead and other heavy metals, leaking from these drums onto the ground. In addition, photographic evidence showed that Jason Maddox disposed of electrical transformers

and car cushion materials at the SMP facility. The plaintiffs' expert testified that these items are known sources of PCBs and lead, two substances that are defined as hazardous under the RCRA. The evidence established that the amounts of PCBs and lead found on the property were at levels that required SMP to notify the EPD. Additionally, there was testimony to the effect that materials found on the SMP facility were explosive, and that they could affect the central nervous system and cause problems in the upper respiratory system. The lead and heavy metals can affect a person's motor skills. Also, a witness testified that materials on the SMP facility spilled onto the ground, entered the soil, and killed trees. Accordingly, the defendants' disposal of hazardous waste harmed the environment and posed a threat to health. On the basis of the above evidence, this harm was substantial. Therefore, Mr. Maddox, L.B. Recycling, and SMP violated § 6972(a)(1)(B).

VI.    Damages Issues

The defendants argue that the award of compensatory and punitive damages should be set aside for several reasons. They argue that the compensatory damages cannot stand because (1) the plaintiffs failed to prove a continuing nuisance; (2) Mrs. Parker did not occupy the house during much of the time for which damages are available; (3) Charles Parker and Sandra Skypek did not own or occupy the property

37

at the time the complaint was filed; and (4) the jury was not charged as to limitations on damages. We address each of these arguments.

A.    Continuing Nuisance

The defendants contend that there was insufficient evidence for the jury to have found that there was a continuing nuisance. Georgia broadly defines nuisance as "anything that causes hurt, inconvenience, or damages to another." Ga. Code Ann. § 41-1-1. The defendants argue that there was insufficient evidence for the jury to find that there was continuing migration of materials onto the Parker property. See Briggs & Stratton Corp. v. Concrete Sales and Servs., 29 F. Supp. 2d 1372, 1378 (M.D. Ga. 1998) (noting that "[a] cause of action for continuing nuisance is limited to situations where the contamination has continued to spread"). The Parkers respond that there was evidence of many materials entering the Parker property, including solid waste, hazardous waste, and storm-water runoff. At the outset, we note that this court is without power to consider the merits of the defendants' contention because the defendants did not move for a judgment notwithstanding the verdict. Dietz v. Consolidated Oil & Gas, Inc., 643 F.2d 1088, 1095 (5th Cir. 1981).[28] The defendants, however, would fare no better if we did consider the evidence. As shown in the

_____

[28] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all published decisions of the former Fifth Circuit issued before October 1, 1981.

38

discussion above, the record shows many instances of materials entering the Parker property from the SMP facility, and the jury's decision on the issue of whether there was a continuing nuisance must stand.[29]  See Goble v. Louisville & Nashville R.R., 200 S.E. 259, 263 (Ga. 1938) ("[E]very continuance of a nuisance which is not permanent, and which could and should be abated, is a fresh nuisance for which a new action will lie."); Smith v. Branch, 487 S.E.2d 35, 38 (Ga. Ct. App. 1997) (same).

B.    Statute of Limitations

The defendants claim that the damages award was incorrect because damages on a claim for nuisance or trespass can only be awarded for injuries that occurred within the four years preceding the filing of the complaint.  Georgia law establishes a four-year statute of limitations for suits pertaining to trespass and damage to realty. Ga. Code Ann. § 9-3-30; see Tucker v. Southern Wood Piedmont Co., 28 F.3d 1089, 1090-91 (11th Cir. 1994).  The inquiry, however, is complicated by the existence of a federal "discovery rule" for environmental torts.  In 1986, Congress amended the Comprehensive Environmental Response, Compensation, and Liability Act of 1980

---

[29] The fact that the Parkers prevented the defendants from coming onto the Parker property to clean up the debris does not prevent a finding of continuing nuisance.  The nuisance was caused by materials migrating from the defendant property.  See City of Gainesville v. Waters, 574 S.E.2d 638, 642 (Ga. Ct. App. 2002); Smith v. Branch, 487 S.E.2d 35, 38-39 (Ga. Ct. App. 1997).  The evidence shows that the defendants did little, if anything, to prevent such migration.

("CERCLA"), in part to address a perceived inadequacy of state laws "dealing with the delayed discovery effect of toxic substance pollution." Id. at 1091. The relevant amendment states:

> In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute.

42 U.S.C. § 9658(a)(1). The term "federally required commencement date" means: "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4). This statute means that "[a]s long as Plaintiffs sued within four years of the time they discovered or should have discovered the wrongs of which they complain, their recovery will not be limited to the four years immediately

40

preceding the filing of the lawsuit." <u>Tucker</u>, 28 F.3d at 1092. Here, the Parkers sued within four years of discovering many of the wrongs committed by the defendants and, therefore, the amount of damages they can collect is not limited to the injuries that occurred within the four years preceding the filing of this suit.

C.      Occupation and Ownership Requirements in the Jury Charge

The defendants also contend that the damages award cannot be upheld because the jury awarded damages to the plaintiffs as a whole. Sandra Skypek and Charles Parker, however, did not own or occupy the Parker property at any relevant time prior to the initiation of this suit. Because ownership or occupancy is a necessary element of a claim for nuisance under Georgia law, <u>Briggs & Stratton Corp. v. Concrete Sales & Servs.</u>, 29 F. Supp. 2d 1372, 1377 (M.D. Ga. 1998); <u>see</u> Ga. Code Ann. § 41-1-4, the defendants argue that Sandra and Charles cannot, as a matter of Georgia law, recover damages for their state law claims. The Parkers respond that the defendants

41

did not object to the jury instructions, which contained no distinction between the three plaintiffs,[30] and, therefore, any error is waived.[31]

After reviewing the record, there is no indication that the defendants raised these contentions in the district court. Normally, when a party fails to object to a jury instruction prior to jury deliberations, that party waives its right to raise the issue on appeal. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1329 (11th Cir. 1999). There are two exceptions to this rule: "first, where a party has made its position clear to the court previously and further objection would be futile; and second, where it is necessary to 'correct a fundamental error or prevent a miscarriage of justice.'" Id. (quoting Landsman Packing Co. v. Continental Can Co., 864 F.2d 721, 726 (11th Cir. 1989)). There is no indication in the record that the defendants made their objection known to the district court and, therefore, only the latter exception is relevant for this appeal. This exception is known as "plain error" review. Id.

---

[30] For example, the jury charge stated: "If the evidence proves nuisance, negligence, negligence per se or trespass on the part of the defendants that was a legal cause of damage to the *plaintiffs*, you should award the *plaintiffs* an amount of money that will fairly and adequately compensate the *plaintiffs* for such damage." (Emphasis added). The district court also instructed that "the plaintiffs are entitled to recover for damages to the person and for damages to the property."

[31] The plaintiffs also argue that a party that obtains title to the land during the pendency of a suit for nuisance or trespass and property contamination is not precluded from recovering damages to that property. The case cited by the plaintiffs for this proposition, however, provides no support for the plaintiffs' assertion. See Tri-County Inv. Group, Ltd. v. Southern States, Inc., 500 S.E.2d 22 (Ga. Ct. App. 1998).

42

Plain error review is very stringent and reversal for incorrect jury instructions will occur only in exceptional cases when the error is so fundamental that it results in a miscarriage of justice. Id. There are four requirements for plain error review: "first, an error occurred; second, the error was plain; third, it affected substantial rights; and finally, not correcting the error would seriously affect the fairness of the judicial proceeding." Id. To meet this standard, the party must prove that the instruction was a misstatement of law that likely led to an incorrect verdict. The instruction must also "'mislead the jury or leave the jury to speculate as to an essential point of law.'" Id. (quoting Pate v. Seaboard R.R., 819 F.2d 1074 (11th Cir. 1987)).

We hold that the district court plainly erred by failing to instruct the jury that damages were not recoverable by a party who did not own or occupy the Parker residence at any relevant time prior to the filing of the complaint in this case. As explained above, ownership or occupancy is a necessary element for the maintenance of a nuisance action.[32] Thus, the jury may have awarded more in compensatory

---

[32] Similarly, some property right is a necessary element for a cause of action alleging a trespass. See Jillson v. Barton, 229 S.E.2d 476, 478 (Ga. Ct. App. 1976) (noting that "a trespass usually is a direct infringement of one's *property rights*" (emphasis added)). Unless Sandra Skypek and Charles Parker can show that they had a property right in their mother's property at the time the complaint was filed, they cannot obtain damages for trespass.

We also note that the jury found the defendants liable under the plaintiffs' negligence and negligence per se claims. We find it difficult to believe that Charles Parker and Sandra Skypek were injured as a result of the defendants' negligence, but that is a question we leave for the

damages than it otherwise would have[33] and, as explained below, the award of punitive damages was certainly erroneous. The error was plain because Georgia law requires ownership or occupancy for a nuisance action. The error also affected the defendants' substantial rights because they have been ordered to pay at least $500,000.00 in punitive damages that likely cannot be awarded under Georgia law.[34] Finally, we conclude that an error of this magnitude resulted in a miscarriage of justice and seriously affected the fairness of the judicial proceedings. Consequently, we reverse the district court's award of compensatory and punitive damages and remand for a new trial on damages.[35] See Georgia Northeastern R.R. v. Lusk, 587

_____

district court to consider on remand.

[33] The jury form did not allocate the compensatory damages award for each plaintiff. Consequently, we cannot determine whether the jury awarded compensatory damages for any injury to Sandra Skypek or Charles Parker.

[34] Georgia law caps punitive damages at $250,000.00 per plaintiff. Ga. Stat. Ann. § 51-12-5.1(g); Bagley v. Shortt, 410 S.E.2d 738 (Ga. 1991). Because it is unlikely that Sandra Skypek and Charles Parker can state valid claims for nuisance or trespass and, therefore, cannot likely recover compensatory damages under these claims, the $250,000.00 award of punitive damages to each of them was likely erroneous. See Wade v. Culpepper, 279 S.E.2d 748, 750 (Ga. Ct. App. 1981), *overruled on other grounds by* Magnetic Resonance Plus, Inc. v. Imaging Sys. Int'l, 543 S.E.2d 32 (2001), ("[I]t is a long-established principle of law that punitive damages are not recoverable when there is no entitlement to compensatory damages.").

[35] The defendants also challenge the jury's award of attorneys' fees and contribution under Georgia's Hazardous Site Response Act. An award of attorneys' fees, where, as here, there is a bona fide controversy, requires a finding of bad faith on the part of the defendants. Latham v. Faulk, 454 S.E.2d 136, 137 (Ga. 1995). The jury found that Mr. Maddox and SMP acted in bad faith. After reviewing the record, we conclude that there was sufficient evidence for the jury to make this award and affirm.

An award for corrective action under Georgia's HSRA is available from "any other

S.E.2d 643 (Ga. 2003) (reversing the damages award for a nuisance action and remanding for a new trial); Schriever v. Maddox, 578 S.E.2d 210 (Ga. Ct. App. 2003) (reversing a jury's damages award on the basis of an incorrect jury charge and remanding for retrial on damages only).

VII. Conclusion

For the foregoing reasons, we hold that Mrs. Parker had standing to assert claims under the CWA and the RCRA, and that there is federal subject-matter jurisdiction over the CWA claims. We have supplemental jurisdiction over the remaining claims. We hold that there was substantial evidence for the jury's verdict regarding the plaintiff's CWA and RCRA claims. Finally, we affirm the jury's award of attorneys' fees and the district court's award of contribution under Georgia's

---

person who has contributed or is contributing to any release of a hazardous waste, a hazardous constituent, or a hazardous substance." Ga. Code Ann. § 12-8-96.1(e). The defendants do not argue that there was insufficient evidence to uphold this award. Rather, they argue that an action for contribution under Georgia's HSRA may only be brought by a liable party against another liable party and they note that the Parkers are not a liable party. Because the defendants' argument challenges a legal question, we review the district court's decision de novo and affirm. The HSRA states that "*any person*" can obtain contribution; it does not limit a contribution award to liable parties. Moreover, case law indicates that contribution is available to the Parkers. See Briggs & Stratton Corp. v. Concrete Sales & Servs., Inc., 20 F. Supp. 2d 1356, 1374-75 (M.D. Ga. 1998), aff'd., 211 F.3d 1333 (11th Cir. 2000) ("[Georgia's HSRA] creates *a private right of action* for recovery of the costs of corrective action from 'any person who has contributed or who is contributing to a release.'") (emphasis added). The defendants have not identified, and we did not find, any contrary precedent. Therefore, we affirm the district court's award under Georgia's HSRA.

HSRA, but reverse the jury's award of compensatory and punitive damages. We remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

FORRESTER, District Judge, concurring in part and dissenting in part:

I respectfully dissent from the portion of the majority opinion's discussion of Plaintiffs' Clean Water Act claims. There is no Clean Water Act violation for the discharge onto Plaintiffs' soil and they allege no kind of standing – including economic standing – to complain of the discharge into the nearby stream.

At trial, Plaintiffs demonstrated contamination of the soil on their land caused by storm-water, sediment, and polluted run-off from Defendants' property.[1] Plaintiffs complained that this contamination diminished the value of their property. Plaintiffs, however, do not have a cause of action under the Clean Water Act because the Act applies only to "navigable waters."

Title 33 U.S.C. § 1311(a) generally prohibits "the discharge of any pollutant by any person" absent compliance with one of the permit systems established in the statute. Under the Act "discharge of pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." *See* 33 U.S.C. § 1362(12)(A).

_____

[1]*See* Trial Transcript, at 81 (Quebell Parker testifying that storm water runoff from the SMP facility would flood her property); at 134, 139, 148, 151-52, 154 (Charles Parker testifying that water, debris, and particles would flow from SMP facility to Parker property); at 309-12 (Plaintiffs' expert Charles MacPherson testifying that he found light material such as automobile fluff, taillight lenses, transformer insulation material, and battery casings on Parker property on other side of silt fence); at 315, 318 (MacPherson testifying that two of five soil samples taken on Parker property showed elevated levels of PCBs and lead). Plaintiffs also alleged that Defendants' lack of compliance with the permitting provisions of the Clean Water Act contributed to this contamination.

"Navigable waters" are defined in the statute as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). Regulations issued by the Environmental Protection Agency further define "navigable waters" as including "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation, or destruction of which could affect interstate or foreign commerce." *See, e.g.*, 40 C.F.R. § 122.2 (internal quotes omitted); 40 C.F.R. § 230.3(s)(3).

Thus, elements of the statute and regulations read together demonstrate that in order to establish a claim under the Clean Water Act, a plaintiff must establish that pollutants have been discharged into navigable waters. This is uniformly cited as an element of such a claim.[2]

Indeed, the Clean Water Act does not provide a cause of action for pollution of all waters of the United States. For example, in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), the Court found that isolated ponds on a proposed municipal solid

---

[2]*See generally United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 171-72 (3d Cir. 2004); *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 946-47 (7th Cir. 2004); *Hughey v. JMS Development Corp.*, 78 F.3d 1523, 1530 (11th Cir. 1996); *Committee to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 308 (9th Cir. 1993); *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 165 (D.C. Cir. 1982).

waste disposal site could not be considered "navigable waters" under the Clean Water Act because they had no "significant nexus" with navigable waters. *Id.* at 167; *see also In re Needham*, 354 F.3d 340, 345-46 (5th Cir. 2003) ("the United States may not simply impose regulations over puddles, sewers, roadside ditches, and the like"; rather, a body of water is subject to regulation only if "actually navigable or directly adjacent to an open body of navigable water").

Whether one says there must be a "significant nexus" or some "hydrological connection" to a water of the United States,[3] Plaintiffs have shown no connection at all between the soil on their property and a navigable water of the United States. As such, they have no cause of action under the Clean Water Act.

There is evidence of a "navigable water" in the case –a small stream running on Defendants' property that eventually flows into the Yellow River. Plaintiffs presented evidence that Defendants dumped sediment, dirt and other pollutants into the stream. Plaintiffs, however, have neither pled nor proven anything that would give them standing to assert a claim with respect to this stream.[4] Plaintiffs are not

---

[3]*Compare United States v. Rapanos*, 339 F.3d 447, 453 (6th Cir. 2003) (interpreting *SWANCC* narrowly to require only a "hydrological connection"), *and United States v. Deaton*, 332 F.3d 698, 702 (4th Cir. 2003) (same), *with In re Needham*, 354 F.3d 340, 345-47 (5th Cir. 2003) (adopting more expansive reading of *SWANCC* and requiring a stricter "significant nexus" in order to meet the definition of "navigable water").

[4]To establish Article III standing in a case brought pursuant to the Clean Water Act, a plaintiff must show (1) injury in fact, (2) traceability, and (3) redressability. *See generally Lujan*

riparian owners of the stream. Their alleged economic damage relates to the soil contamination on their dry land and noise coming from the operation of Defendants' business.[5] Plaintiffs have not connected the diminution in their property to anything that happened in the nearby stream. Further, Plaintiffs have raised no recreational or aesthetic concerns for the stream.

---

*v. Defenders of Wildlife*, 504 U.S. 555 (1992). The injury in fact must be an "invasion of a legally protected interest that is 'concrete and particularized.'" *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) (en banc). The injury must affect the plaintiff in a personal and individual way. *Id.* (finding standing for plaintiff who owned lake in path of defendant's toxic chemical discharge and testified his family swam and fished less in the lake and his property value declined).

A plaintiff may show an aesthetic, recreational, or economic injury. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 181-83 (2000) (noting that plaintiffs drove over river, fished, camped, swam, and picnicked in and near river and one member of plaintiff's organization testified that her home was located near defendant's facility and she believed her property value was diminished because of the pollutant discharges from the facility); *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 518-19 (4th Cir. 2003) (considering economic impact of pollutant discharges on a plaintiff's river guide business); *Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985, 994 (9th Cir. 2000) (plaintiffs testified about aesthetic and recreational use of water); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 556 (5th Cir. 1996) (same); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72-73 (3d Cir. 1990) (same).

[5]At trial, Plaintiff Charles Parker testified that "if we take away the facility next door . . . for residential [the property] should appraise in around the 90,000 range. And for commercial, it should be up around about 130." Trial Transcript, at 167. Mr. Parker was also asked whether he had any opinion on the "diminution in the value, if any, in the property because of the facility." *Id.* He responded "for residential . . . the value is greatly depressed because of the nuisance factor next door, the noise. For commercial, it is not marketable." *Id.* Charles MacPherson, the environmental consultant who testified for the Parkers at trial, stated that he believed it would cost between $300,000 and $400,000 to investigate and remediate both the Parkers' and Defendants' property. Trial Transcript, at 336-37. The substantial portion of remediation would involve investigation and monitoring the property for contamination. *Id.* Removing any contaminated soil from the Parker property could cost between $25,000 and $45,000. *Id.* at 338.

Therefore, I would hold that Plaintiffs have no cause of action under the Clean Water Act with respect to contamination of their soil and that they have no standing to assert any claims for pollution of the stream running behind Defendants' property. Because I conclude that Plaintiffs cannot bring a claim under the Clean Water Act, I would vacate the district court's award of $18,360 in civil penalties under the Act. *See* Order, August 8, 2003, at 47. Similarly, I would also vacate the injunctive relief ordered by the district court under the Clean Water Act. *See id.*, at 47-51.

In all other respects, I concur in the majority's opinion.